1  MICHAEL ZWEIBACK (SBN 143549)
   STEPHEN G. LARSON (SBN 145225)
2  MICHAEL M. KOWSARI (SBN 186899)
   **ARENT FOX LLP**
3  555 West Fifth Street, 48th Floor
   Los Angeles, CA 90013-1065
4  Telephone: 213.629.7400
   Facsimile: 213.629.7401
5  Email: michael.zweiback@arentfox.com
           stephen.larson@arentfox.com
6          michael.kowsari@arentfox.com

7  MATTHEW M. GORMAN (SBN 214628)
   **THE GORMAN LAW FIRM**
8  1346 E. Walnut Street, Suite 220
   Pasadena, CA 91106
9  Telephone: 626.215.5951
   Facsimile: 626.476.5470
10 Email: mgorman@gorman.firm.com

11 Attorneys for Plaintiff
   TIANGANG SUN
12

13              UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15                    WESTERN DIVISION

16

17 TIANGANG SUN,                    Case No. **CV13-05355** BRO (Ex)

18           Plaintiff,             **COMPLAINT FOR VIOLATIONS
                                    OF ALIEN TORT CLAIMS ACT**
19 v.                              **(Commission of and Attempted
                                    Torture; Cruel, Inhuman or
20 CHINA PETROLEUM &                Degrading Treatment; and Arbitrary
   CHEMICAL CORPORATION             Arrest and Detention); RACKETEER
21 LIMITED, a joint stock limited   INFLUENCED AND CORRUPT
   company of the People's Republic of   ORGANIZATIONS ACT;
22 China; and DOES 1 to 10, inclusive,   INTENTIONAL INFLICTION OF
                                    EMOTIONAL DISTRESS;
23           Defendants.            NEGLIGENT INFLICTION OF
                                    EMOTIONAL DISTRESS;
24                                  ASSAULT; FALSE
                                    IMPRISONMENT; and MALICIOUS
25                                  PROSECUTION**

26                                  **DEMAND FOR JURY TRIAL**

27

28

1    Plaintiff TIANGANG SUN (hereinafter "Mr. Sun") alleges his complaint

2    against Defendant CHINA PETROLEUM & CHEMICAL CORPORATION

3    LIMITED, also known as SINOPEC CORP. (hereinafter "SINOPEC"), a joint

4    stock limited company organized and existing under the laws of the People's

5    Republic of China ("PRC"), and Does 1 to 10 (collectively "Defendants"), as

6    follows:

7                              **SUMMARY OF ACTION**

8         1.     Defendants engaged in a wide-spread, systematic, and years-long

9    conspiracy to conduct racketeering activity and a criminal enterprise. Defendants,

10   including one of the world's largest oil and natural gas companies SINOPEC, PRC

11   government officials, and others acting on their behalf, illegally detained and

12   tortured Mr. Sun; illegally seized and converted Mr. Sun's assets; systematically

13   engaged in an array of illegal conduct to obstruct justice and use the criminal justice

14   system of the PRC to eliminate risks posed by Mr. Sun's civil lawsuit against

15   SINOPEC; and made false and misleading public statements to investors to conceal

16   the true nature of their enterprise and their business methods.

17        2.     The target of Defendants' enterprise was Mr. Sun, a highly-regarded

18   entrepreneur, businessman, and family man before he was imprisoned and tortured

19   by Defendants. Over the span of several decades, Mr. Sun conceptualized and

20   successfully built and managed a number of business ventures, including the oil and

21   energy holding company GeoMaxima Energy Holdings Company Ltd.[1] ("GEHC"),

22   eventually becoming one of the first self-made billionaires in the PRC.

23        3.     By virtue of their conspiracy and wrongful conduct, Defendants

24   violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

25   §§ 1961, *et seq.* ("RICO"). In the course of committing the predicate acts

26   constituting Defendants' criminal enterprise, Defendants violated the Alien Tort

---

[1] GEHC was formed and became listed on the Hong Kong Stock Exchange under ticker number 702. Over a series of transactions, Mr. Sun acquired a 60.7% interest in GEHC with the remaining 30.3% held by shareholders who acquired GEHC stock on the public market.

1  Claims Act; intentionally and negligently inflicted emotional distress upon Mr.

2  Sun; assaulted Mr. Sun; and falsely imprisoned and maliciously prosecuted Mr. Sun

3  in a manner that has inflicted substantial economic and non-economic harms on Mr.

4  Sun.

5  ## THE PARTIES

6       4.     Plaintiff Mr. Sun is presently residing in Los Angeles County,

7  California, and is a citizen of the Hong Kong Special Administrative Region of the

8  PRC.

9       5.     Defendant SINOPEC is a corporation organized under the laws of the

10  PRC.  Its corporate headquarters is situated in Beijing, PRC.

11       6.     SINOPEC wholly owns Sinopec International Company Limited

12  ("Sinopec International"), which is based in Beijing.  SINOPEC organized Sinopec

13  International to serve as its internal Procurement Management Department and

14  "trading arm," functioning to manage SINOPEC's overseas procurement and

15  supply system and to be responsible for implementing SINOPEC's global purchase

16  of bulk, universal and key materials and equipment.  There are likewise many

17  overlapping management positions between SINOPEC and Sinopec International.

18  As such, Sinopec International is the agent and/or alter ego of SINOPEC.

19       7.     Sinopec International, in turn, wholly owns Sinopec USA Co., Ltd.

20  ("Sinopec USA"), a corporation incorporated in Delaware with offices in Houston,

21  Texas, and New York, New York.

22       8.     Sinopec USA was formed by SINOPEC to serve as Sinopec

23  International's United States branch office in SINOPEC's internal procurement

24  management system (including commodity trading) and to conduct other of its

25  business activities, including the purchase and sale of key materials and equipment.

26       9.     Upon information and belief, SINOPEC controls the activities of

27  Sinopec USA, including tight supervision and review of its purchases, employment

28  decisions, and management positions.  As such, Sinopec USA is the agent and/or

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

1    alter ego of SINOPEC.

2         10.    Mr. Sun is informed and believes, and on that basis alleges, that all

3    Defendants herein named as DOES, at all relevant times hereto were and are the

4    partners, principals, agents, servants, employees, co-conspirators, and/or joint

5    venturers of the others, and that Mr. Sun's damages as alleged herein are the results

6    of the acts and/or omissions of such Defendants committed and/or omitted in the

7    course and scope of such conspiracy, partnership/agency relationship and/or joint

8    venture, and that each of them is contractually, intentionally, negligently, or in

9    some manner legally responsible for the acts and damages herein alleged.

10        11.    Wherever reference is made to individuals who are not named as a

11   Defendant in this Complaint, but who were officers, directors, employees, and/or

12   agents of a Defendant, such individuals at all relevant times acted on behalf of the

13   Defendant named in this Complaint within the scope of their respective

14   employment, or alternatively, upon information and belief, Defendant subsequently

15   ratified their actions.

16        12.    Mr. Sun is informed and believes, and on that basis alleges, that at all

17   times herein material, SINOPEC conspired with PRC government officials and

18   others, by entering into an agreement to commit wrongful and tortious acts

19   contained herein and participated in or committed overt acts in furtherance of said

20   conspiracy.

21                           **JURISDICTION AND VENUE**

22        13.    This Court has jurisdiction over Mr. Sun's claims under 28 U.S.C.

23   § 1331 (federal question jurisdiction), 18 U.S.C. § 1964(c) (Racketeer Influenced

24   and Corrupt Organizations Act), and 28 U.S.C. § 1350 (Alien Tort Claims Act).

25        14.    In addition, Mr. Sun invokes the supplemental jurisdiction of this

26   Court, 28 U.S.C. § 1367, over claims based on the laws of the State of California

27   because said state law claims are so related to the RICO and Alien Tort Claims Act

28   claims that they form a part of the same case or controversy.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

15.     Venue is proper in the Central District of California pursuant to (a) 18 U.S.C. § 1965(a), because SINOPEC resides in this District as a result of the fact that the Court has personal jurisdiction over it; (b) 18 U.S.C. § 1965(b), because the ends of justice require that the parties residing in any other district be brought before this Court; (c) 28 U.S.C. § 1391(b)(1), because SINOPEC resides in this District; (d) 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this action occurred in this District; and (e) 28 U.S.C. § 1391(b)(3), because SINOPEC is subject to the Court's personal jurisdiction in this District.

## EXHAUSTION

16.     This Court is the only appropriate forum for adjudication of this action because the government of the PRC is a co-conspirator and participant in some of the unlawful acts alleged in this Complaint.

17.     On information and belief, there is no independent functioning judiciary in the PRC, and any suit against SINOPEC would have been and would still be futile and would result in serious reprisals against Mr. Sun and his family.

18.     The United States State Department 2012 Country Report for the PRC's Human Rights Practices found that, in the PRC, there exists "political control of courts and judges" and "closed trials." It also concluded that "in practice the judiciary [in the PRC] was not independent.  Judges regularly received political guidance on pending cases, including instructions on how to rule, . . . particularly in politically sensitive cases."

19.     This experience was borne out when Mr. Sun initially attempted to secure redress for business harms by filing a civil suit against SINOPEC in Hong Kong and then Beijing.  Those filings resulted in his arbitrary imprisonment in a PRC detention facility for five years.

20.     Additionally, Mr. Sun cannot sue in the PRC or Hong Kong due to repeated and continuous threats against him by SINOPEC, PRC government

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1  officials, and others acting on their behalf, who have told Mr. Sun that he will face

2  prolonged incarceration, confiscation of property, and harm to his family if he

3  commences a legal action. Those threats took on added meaning following Mr.

4  Sun's visit to Hong Kong in April, 2013, where he barely escaped the clutches of

5  SINOPEC and PRC government agents when they attempted to kidnap and detain

6  him once again.

7      21.    Based on such present ongoing threats and the prior conduct by PRC

8  government officials orchestrated by SINOPEC, Mr. Sun faces a credible and

9  imminent threat to his person should he file suit in the PRC or Hong Kong. Such

10  legal forums are thus unavailable, ineffective, inadequate, and obviously futile to

11  Mr. Sun for the adjudication of his claims.

12      22.    Given the importance of this matter to the PRC government and its

13  direct involvement in the alleged illegal acts, Mr. Sun cannot obtain a fair trial of

14  his claims in any legal forum controlled or influenced by the PRC.

15  **GENERAL FACTUAL ALLEGATIONS**

16  **The Tahe Oil Field Ventures**

17      23.    As a businessman, Mr. Sun is known for taking risks on ventures

18  generally perceived as having marginal chances of significant return, such as

19  cutting-edge technology or complex business problems others are unable to resolve.

20  As a chemical analyst, Mr. Sun was interested in the emerging Chinese energy and

21  natural resources industry.

22      24.    In 1998, Mr. Sun entered into various agreements with a relatively

23  small state-owned oil enterprise, China National Star Petroleum Corporation

24  ("National Star"), for the development of oil, natural gas, and other energy

25  resources in the PRC. One resulting product of these agreements was the eventual

26  formation of a joint venture called GeoMaxima Energy Company ("GeoMax").

27  Ownership in GeoMax was divided between Mr. Sun and National Star. Mr. Sun's

28  ownership interest in GeoMax was subsequently transferred to GEHC.

25.     Following its formation, GeoMax undertook several projects to develop energy and natural gas projects throughout the PRC.  One such project was the construction and operation of a pipeline to service the Tahe Oil Field in the Takelamagan desert in Xinjiang Province.  The Tahe Oil Field was discovered in 1997 and, according to initial surveys, was believed to contain only modest oil reserves.  For the oil field to be economically viable, oil and natural gas would have to be transported to distant commercial markets in the PRC.

26.     National Star held the rights to the oil and other natural resources in the Tahe Oil Field, and transported the oil along roadways in tanker trucks.  Given high transportation costs, to make the venture economically viable National Star needed to construct a pipeline from the oil field closer to commercial markets in the PRC.  Because many people considered the oil field to have limited energy resources, an investment in such a pipeline was risky.

27.     Undeterred, Mr. Sun pursued the investment.  In 1998, GeoMax and National Star entered into a joint venture agreement (the "JV Agreement") to form XinJiang XingMei Oil-Pipeline Company Ltd. (hereinafter, the "Pipeline Company"), for the construction of the Tahe Oil Field pipeline.

28.     Under the JV Agreement, GeoMax was to contribute ¥44.8 million in capital to the Pipeline Company, and National Star was to contribute ¥11.2 million in capital.  Although GeoMax shortly thereafter contributed the required capital to the Pipeline Company, National Star was allowed to defer its capital contribution.

29.     Under the various contracts between the companies (collectively, the "Pipeline Agreement"), GeoMax would construct and operate a 69.4 kilometer oil pipeline with a capacity of 2.0 million tons/year; National Star would pay GeoMax ¥48 (Renminbi) per ton transported; and, finally, as an enticement to GeoMax given the significant financial risk, National Star granted GeoMax a 20-year exclusive right to transport all the oil extracted from the Tahe Oil Field (the "20-Year Exclusivity Clause").

30.     At the time of its formation, GeoMax owned 80% of the Pipeline Company and National Star owned the remaining 20%.  On account of National Star's 49% stake in GeoMax, National Star effectively held the controlling interest in the Pipeline Company.

31.     As pipeline construction began, new oil reserves were discovered in the Tahe Oil Field, vastly increasing the known oil-production capacity of the field.

32.     In February, 2000, the Pipeline Company completed construction of the pipeline to the Tahe Oil Field.  The pipeline began operating at full capacity, providing an efficient and effective means of transporting oil from the far-flung Tahe Oil Field to commercial centers in the PRC as envisioned in the Pipeline Agreement.

33.     The Pipeline Company far exceeded its profit projections for the first year, generating ¥57 million in profits.  Mr. Sun's entrepreneurial instincts had paid off.

### SINOPEC's Ties to PRC Government Officials

34.     As Mr. Sun worked tirelessly to realize a return on his risky venture, SINOPEC was waiting in the wings to take advantage of his efforts.

35.     SINOPEC generates more annual revenue than any other company in the PRC.  Given its size and prominent role in the PRC, SINOPEC is purported to have significant and, upon information and belief, corrupt ties to many government officials in the PRC.

36.     Many former executives of SINOPEC's corporate state-owned parent, China Petrochemical Corporation, now serve in high-level positions within the PRC Communist Party.  One former executive serves as the deputy party chief in Fujian province, a province strategically situated on the Taiwan straits.  Another executive sits on the Politburo's Standing Committee with responsibility for the PRC's internal security apparatus.

37.     By virtue of its corporate parent's relationships with the Communist

1    Party and PRC officials, SINOPEC has leveraged its position to insulate itself from

2    competition, enjoying easy access to credit from state-owned banks and benefiting

3    from preferential treatment from PRC law enforcement officials.  In sum,

4    SINOPEC's network reaches into every crevice of the PRC economy and

5    government allowing it, through political nepotism and corruption, to operate

6    outside the framework of a market economy.  There are no laws that effectively

7    govern SINOPEC's business or political behavior.

8                        **SINOPEC's Takeover of National Star**

9           38.    When the pipeline was completed, SINOPEC's business was

10   principally focused on midstream (oil refinery) and downstream (gas service

11   stations) operations.  SINOPEC desired a more integrated operation that included

12   an expanded footprint in the exploration and production of oil, natural gas, and

13   other energy resources.  The Tahe Oil Field's vast lucrative oil reserves provided a

14   natural target for SINOPEC to immediately realize that goal.[2]

15          39.    As a state-owned enterprise, National Star was subject to tight control

16   by the PRC government.  Through various government levers, SINOPEC

17   orchestrated a series of government bureaucratic actions so that by October 24,

18   2001, National Star became a wholly-owned SINOPEC subsidiary.  Thereafter,

19   SINOPEC quickly removed National Star's senior executives and managers.

20          40.    As a consequence of the acquisition, National Star's rights to the Tahe

21   Oil Fields were transferred to SINOPEC's control.

22          41.    Not long after SINOPEC acquired National Star, SINOPEC's then-

23   Vice-Chairman, MR. CHEN TONGHAI,[3] publicly declared that the company

24   would not permit foreigners – including Hong Kong-based companies such as

25

26   [2] The importance of adding the Tahe Oil Field to its natural resource portfolio was subsequently confirmed in a
     March 26, 2008, SINOPEC press release: "*Tahe oil field is in the process of becoming the most important production*
27   *improvement area and replacement region of Sinopec.*"  (Emphasis added).
     [3] CHEN TONGHAI was Vice Chairman of SINOPEC's Board of Directors through 2002, and Chairman of the
28   Board from 2003 to June 22, 2007, when he became embroiled in an unrelated bribery scandal.  He was subsequently
     convicted and is currently incarcerated in the PRC.

1   GEHC or GeoMax – to own the Tahe Oil Fields pipeline.

2       42.    Mr. Sun is informed and believes, and on that basis alleges, that

3   SINOPEC thereafter engaged in efforts to economically damage and oust the

4   Pipeline Company from further participating in the Tahe Oil Field.  SINOPEC

5   refused to pay the Pipeline Company its oil transportation fees required under the

6   Pipeline Agreement and arbitrarily increased the electrical fees charged to the

7   Pipeline Company to a level that made it infeasible for the Pipeline Company to

8   operate.

9       43.    Most importantly, in May, 2002, SINOPEC secretly commenced

10   construction of a second pipeline to the Tahe Oil Field in direct violation of the 20-

11   year Exclusivity Clause.

12       44.    On October 15, 2002, SINOPEC completed construction of the second

13   pipeline and immediately began diverting oil pumped from the Tahe Oil Field to

14   the second pipeline.

15       45.    In 2003, SINOPEC notified Mr. Sun that it (a) terminated its

16   collaboration as a partner in the GeoMax joint venture; (b) refused to make its

17   capital contributions to the Pipeline Company; and (c) would not honor its contract

18   to pump oil through the Pipeline Company's pipeline.

19       46.    As a consequence, the Pipeline Company's revenues dramatically

20   declined, creating extreme financial distress for the company, its joint venture

21   investor, GeoMax, and the investor's owner, GEHC.

22               **Hong Kong Lawsuit Against SINOPEC**

23       47.    In or about October, 2004, Mr. Sun filed a lawsuit on behalf of the

24   Pipeline Company against SINOPEC, entitled *Xinjiang Xingmei Oil Pipeline*

25   *Company, Ltd. v. China Petroleum & Chemical Corporation* [2005] HKCFI 63, in

26   the Hong Kong judicial system (hereafter the "Hong Kong Lawsuit") to seek

27   redress for the economic damage caused by SINOPEC's actions.

28       48.    Mr. Sun is informed and believes, and on that basis alleges, that among

1   other things, SINOPEC officials were worried that the Hong Kong Lawsuit

2   threatened to expose the elaborate accounting methods the company had devised

3   and implemented to systematically overstate the value of its operations in the Tahe

4   Oil Field, including dramatically overstating the oil field's production.

5        49.    For example, in a February 1, 2001, press release, SINOPEC touted its

6   recent acquisition of the Tahe Oil Field by falsely claiming that oil production for

7   the year had reached 2.15 million tons. In fact, production had never exceeded

8   900,000 tons for 2000 or 2001. Similarly, in a 2003 announcement, SINOPEC

9   falsely claimed that "the crude oil that is produced in Sinopec's Tahe oil field"

10  would "exceed 3.5 million tons/year." Again, production was significantly less.[4]

11       50.    Mr. Sun exposed SINOPEC's misrepresentations in the Hong Kong

12  court when he produced the Pipeline Company's detailed accounting ledger ("the

13  Ledger") of the oil actually pumped from the Tahe Oil Fields between 2000 through

14  2005.

15       51.    The Ledger confirmed that in the year 2000 only 852,910 tons of oil

16  were pumped from the Tahe Oil Field, less than half of what SINOPEC had

17  reported in its February, 2001, press release. The same held true for the following

18  year, with the Ledger showing only 840,051 tons of oil pumped from the Tahe Oil

19  Field. Likewise, the Ledger showed that for 2003 only 1.295 million tons of oil

20  were pumped from the Tahe Oil Field, less than one-third of what SINOPEC had

21  publically reported in its 2003 announcement.

22       52.    After the Ledger was produced in the Hong Kong Lawsuit, SINOPEC

23  officials threatened Mr. Sun not to further publish it.

24       53.    Mr. Sun thereafter attempted to informally resolve the lawsuit.

25  Through an intermediary who held a close personal relationship with SINOPEC's

26  then-Chairman MR. CHEN TONGHAI, Mr. Sun conveyed a message proposing

27  _____

28  [4] Another SINOPEC press release similarly touted that "[a]s much as 95.3 million tons of oil was discovered in the Tahe Oil Field . . . surpass[ing] the 2007 estimate by 27% . . . . It is expected that Tahe Oil Field will produce 6.09 million tons of crude oil and 1.05 billion cubic meters of natural gas in the year 2008."

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1    settlement of the claims and full resolution of the dispute.  Upon receiving this

2    message, MR. CHEN TONGHAI relayed a clear and simple response,

3    encapsulating in straightforward terms SINOPEC's attitude toward Mr. Sun: "Tell

4    Mr. Sun that, with a simple phone call, I can have him thrown in jail for the rest of

5    his life."

6         54.    In December 2004, the Hong Kong court dismissed the lawsuit without

7    prejudice, stating that the proper venue was in Beijing.

8         55.    After the Hong Kong Lawsuit was dismissed, Mr. Sun repeatedly

9    attempted to resolve the dispute with SINOPEC instead of filing a new action in the

10   PRC.  During these negotiations, high-level SINOPEC officials repeatedly warned

11   Mr. Sun that he would face personal risk if he re-filed his claims against SINOPEC

12   in Beijing.

13   **Beijing Lawsuit Against SINOPEC and the Formation of an Enterprise**

14        56.    Facing the devastating economic consequences of SINOPEC's actions

15   and having no recourse in Hong Kong, Mr. Sun had no choice but to pursue legal

16   action in the PRC.  In or about February, 2005, Mr. Sun re-filed the lawsuit in

17   Beijing on behalf of the Pipeline Company (hereinafter, the "Beijing Lawsuit").

18   The Pipeline Company sought an order requiring SINOPEC to honor the Pipeline

19   Agreement (including the 20-Year Exclusivity Clause) and damages for

20   SINOPEC's breach of contract.  The Pipeline Company once again submitted the

21   Ledger to support its damages claim.

22        57.    In April, 2005, SINOPEC's then-Director of Finance, MS. WANG

23   LISHENG, requested a private in-person meeting with Mr. Sun as a final effort to

24   resolve the Beijing Lawsuit.  At this meeting, MS. WANG LISHENG demanded

25   that Mr. Sun dismiss the Beijing Lawsuit or face severe personal consequences.

26   Mr. Sun refused to dismiss the lawsuit.

27        58.    Mr. Sun is informed and believes, and on that basis alleges, that MR.

28   CHEN TONGHAI and others thereafter formed and directed an enterprise (the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

1    "ENTERPRISE") utilizing SINOPEC's strong inside, corrupt connections with

2    PRC government and Communist Party officials.  The ENTERPRISE's purpose

3    was to coordinate and cause criminal charges to be brought against Mr. Sun and

4    thereby end Mr. Sun's efforts to pursue legal redress against SINOPEC and

5    eliminate the associated risks the lawsuit posed to SINOPEC.

6        59.     The ENTERPRISE was composed of MR. CHEN TONGHAI, other

7    SINOPEC officials (including MS. WANG LISHENG, MR. KANG XIANZHANG

8    and MR. WU JINZHU), PRC government officials, and other agents, including, but

9    not limited to, MR. DAVID AN, MR. JIN JIANYI, MR. ZHANG YUPING, MRS.

10    XING XIAOJING, and JOHN DOES NOS. 1 and 2.[5]

11        60.     MR. DAVID AN owns and is the Chairman of a Hong Kong company,

12    Hans Energy Company Ltd., that does business with SINOPEC and is currently

13    engaged in a dispute with SINOPEC over payments on an oil storage lease.

14        61.     MR. JIN JIANYI works as an assistant to MR. DAVID AN at Hans

15    Energy Company Ltd.

16        62.     MR. ZHANG YUPING was a Vice President and board member at

17    one of Mr. Sun's companies.

18        63.     MRS. XING XIAOJING, the wife of MR. ZHANG YUPING, is the

19    nominal majority owner of a company called Hong Chang Group Ltd.

20        64.     JOHN DOE NO. 1 is a PRC law enforcement official who became

21    acquainted with Mr. Sun while he was detained in the detention facility.

22        65.     JOHN DOE NO. 2 is a high-level PRC security official working at the

23    central government's legal affairs department.

24        66.     Although the members of the ENTERPRISE knew that Mr. Sun had

25    not committed any crime, the ENTERPRISE pursued criminal misconduct

26    allegations against him at the direction of MR. CHEN TONGHAI and others.  The

27

28    [5] All individuals, entities, or groups whose names are presented in all capital letters in the Complaint were and are members of this ENTERPRISE.

1   ENTERPRISE's goal was to manipulate the criminal justice process to bring
2   financial and personal ruin upon Mr. Sun, to eliminate any civil law suit risk to
3   SINOPEC which it was feared would lead to exposure of SINOPEC's unscrupulous
4   business and accounting practices.

5        67.    To achieve this goal, in May 2005, Mr. Sun is informed and believes,
6   and on that basis alleges, that MR. CHEN TONGHAI enlisted the assistance of
7   MR. ZHOU YONGKANG.  At that time, MR. ZHOU YONGKANG was a high-
8   level government official – he was the head of the PRC's Ministry of Public
9   Security, a member of the PRC State Council, and a member of the Politburo of the
10  Central Committee of the Communist Party.

11       68.    Mr. Sun is informed and believes, and on that basis alleges, that in or
12  about June, 2005, MR. ZHOU YONGKANG assigned personnel within the
13  Ministry of Public Security to work under the direction of SINOPEC'S Chairman,
14  MR. CHEN TONGHAI, and other ENTERPRISE members to develop a plan to
15  have Mr. Sun imprisoned and convicted of false criminal charges based on
16  contrived evidence that was manufactured to retroactively legitimize their actions.
17  The plan's goal was to eliminate any civil lawsuit risks to SINOPEC.

18       69.    Mr. Sun is informed and believes, and on that basis alleges, that at or
19  near the same time, MR. CHEN TONGHAI directed SINOPEC personnel and other
20  ENTERPRISE members to assist the Ministry of Public Security's efforts.

21       70.    In or about July, 2005, the ENTERPRISE's corrupt exercise of
22  political influence led to the formation of Case Investigation Team No. 816
23  ("TEAM 816").  Mr. Sun is informed and believes, and on that basis alleges, that
24  TEAM 816 was a unit of the ENTERPRISE consisting of PRC government
25  officials and SINOPEC officials.  TEAM 816 was formed and organized with the
26  intent to cause Mr. Sun and others to be wrongfully imprisoned by PRC law
27  enforcement agencies and charged with false crimes.

28       71.    Mr. Sun is informed and believes, and on that basis alleges, that the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1    ENTERPRISE formed TEAM 816 with the objective of securing dismissal of the

2    Beijing Lawsuit and thereby eliminate the associated risk it posed to SINOPEC.

3          72.    Mr. Sun is informed and believes, and on that basis alleges, that the

4    following PRC government officials and SINOPEC officials were members of

5    TEAM 816 and/or participated in the ENTERPRISE's objective to protect

6    SINOPEC's business misconduct by silencing Mr. Sun:

7                    a.    CHEN TONGHAI (SINOPEC);

8                    b.    KANG XIANZHANG (SINOPEC);

9                    c.    WU JINZHU (SINOPEC);

10                   d.    ZHENG SHAODONG (PRC);

11                   e.    GAO FENG (PRC);

12                   f.    LIU WEI (PRC);

13                   g.    NIE WENQUAN (PRC);

14                   h.    HE DIAN (PRC);

15                   i.    ZHAO GANG (PRC);

16                   j.    WANG YU (PRC);

17                   k.    WANG ZONGXING (PRC);

18                   l.    KANG NIUHU (PRC);

19                   m.    WANG YANQIU (PRC);

20                   n.    YANG XUEFENG (PRC);

21                   o.    WANG XIANWEI (PRC);

22                   p.    LI SIYUAN (PRC);

23                   q.    WANG HAICHAO (PRC); and

24                   r.    XI DAIBING (PRC).

25         73.    In furtherance of this scheme, on or about July 29, 2005, SINOPEC

26    filed a "countersuit" against Mr. Sun in the Beijing Lawsuit, knowingly making the

27    false allegation that the Pipeline Agreement was void because Mr. Sun had bribed

28    National Star's then-former-Chairman, Mr. Zhu Jiazhen, to obtain the 20-Year

1    Exclusivity Clause to the Tahe Oil Field.

2                    **Detention of Mr. Sun**

3         74.    Mr. Sun is informed and believes, and on that basis alleges, that on or

4    about August 10, 2005, MR. CHEN TONGHAI and other members of the

5    ENTERPRISE directed TEAM 816 to detain Mr. Sun, seize his companies, and

6    interrogate his companies' personnel, all as a means of quelling the Beijing

7    Lawsuit.  On the following day, plainclothes government security officers detained

8    Mr. Sun without a warrant or document indicating the basis for his detention.

9         75.    Without being charged with any crime, Mr. Sun was flown to the Jilin

10   Province in northeast PRC, where he was imprisoned in a detention facility.  Mr.

11   Sun remained wrongfully incarcerated at the Jilin detention facility for the next five

12   years during which time Mr. Sun had no contact with his family, who had little

13   knowledge of his whereabouts or why he was being held.  Consequently, he also

14   lost complete control of his business entities, including GEHC and GeoMax among

15   others.

16        76.    Mr. Sun was not informed of the charges against him until 16 days

17   after being brought to the detention facility.  He was not permitted to meet with an

18   attorney until nearly three months after being detained.  The PRC restricted his

19   access to an attorney and permitted only short meetings in the presence of prison

20   guards once every few months.[6]  Mr. Sun was not brought before a court until

21   approximately three years after being detained.

22   **The ENTERPRISE Orchestrates the Seizure of GEHC and Dismissal of the**

23                        **Beijing Lawsuit**

24        77.    With Mr. Sun detained and unable to defend his businesses, the

25   ENTERPRISE devised a scheme to effectively crush Mr. Sun's business empire.

26        78.    TEAM 816 members raided the GEHC and GeoMax offices, and those

27

28   _____
     [6] Nearly a year after his detention, Mr. Sun retained a private local provincial counsel to represent him, but even then
     he was only allowed to briefly meet his counsel every few months and only in the presence of prison guards.

1   companies' board members were forced to resign and flee to the countryside.

2   Board members who did not resign were detained by TEAM 816 members.  Among

3   those detained were GeoMax's chief financial officer, the company's account

4   manager, its office manager, the Vice President for Mainland China operations and

5   Mr. Sun's private driver.  In 2010, GeoMax's Vice President of Mainland China

6   operations, Mr. Shi Linhua, died in prison.

7        79.    On August 22, 2005, GEHC's board, directed by MR. ZHANG

8   YUPING, an official in Mr. Sun's companies who was collaborating with the

9   ENTERPRISE, announced that Mr. Sun had "resigned" from the company.  Upon

10  information and belief, Mr. Sun alleges that MR. ZHANG YUPING had begun

11  secretly collaborating with SINOPEC and PRC security officials who were TEAM

12  816 members during the weeks leading up to Mr. Sun's detention.

13       80.    By September 8, 2005, with Mr. Sun imprisoned, Mr. Sun's entire

14  shares and interests in GEHC were purportedly "sold" to Hong Chang Group Ltd.

15  ("HCG").  The "sale" was premised on a fabricated "default" on a debenture.  HCG

16  was a sham company with no background in oil and energy development.  HCG

17  was "majority-owned" by MRS. XING XIAOJING, the wife of the collaborating

18  company official MR. ZHANG YUPING.  With SINOPEC's control of GEHC's

19  board complete, the "reconstituted" GEHC dismissed the Beijing Lawsuit against

20  SINOPEC in December, 2005. [7]

21                **The Conditions of Mr. Sun's Imprisonment for Five Years**

22       81.    While his business empire was in chaos, Mr. Sun was isolated in a

23  remote detention facility, where he endured an initial non-stop, 30-hour

24  interrogation session by dozens of investigators from TEAM 816.  During this

25  interrogation, Mr. Sun was not provided any food or water, was not allowed to

26

27  [7] When GEHC was "sold" to HCG in September, 2005, Mr. Sun's signature was forged on corporate documents to
    cause the Pipeline Company to be "transferred" to a third party entity related to MR. ZHANG YUPING.  The
28  Pipeline Company was later sold at a public auction to a company owned by either MR. ZHANG YUPING or his
    wife MRS. XING XIAOJING.

1   sleep, and was forbidden from using the lavatory.  Numerous SINOPEC employees,

2   who were ENTERPRISE members, attended and participated in his interrogation.

3       82.   For the next five years, Mr. Sun was forced to endure an array of

4   hostile conditions and inhumane treatment.  For example, he was provided

5   substandard meals and clothing.  He was housed in a cell that was nearly lightless

6   and overcrowded with other detainees.  Mr. Sun was not provided a mattress or

7   bedding, but was forced to sleep on a concrete floor.

8       83.   During his detention, Mr. Sun developed respiratory problems that

9   were untreated and persist to this day.  The detention center's medical facility was

10   so inadequate that sick detainees refused to be treated there because so many

11   patients died during "treatment."

12       84.   During this five year period, Mr. Sun endured regular interrogations.

13   Occasionally, these interrogations would last more than 24 hours, conducted by

14   "teams" of interrogators from TEAM 816, who took turns interrogating Mr. Sun

15   continuously, rotating their time between interrogation team members to create an

16   uninterrupted cycle of interrogation.  Again SINOPEC employees attended and

17   participated in these interrogations.  Again during these lengthy interrogations, Mr.

18   Sun was not provided any food or water, was not allowed to sleep, and was

19   forbidden from using the lavatory.

20       85.   These interrogations took place in an isolated "interrogation room"

21   apart from other detainees and detention facility personnel.  Mr. Sun often saw the

22   physical results of the torture and harm endured by others in the "interrogation

23   room."  Their bodies were damaged from beatings and torture techniques

24   administered by "interrogators," evidencing bruises and cut skin, torn fingernails,

25   broken fingers, flayed wrists, and other injuries.  Occasionally the cries of detainees

26   were heard emanating from the "interrogation room" as they were tortured.  Mr.

27   Sun lived in constant fear of being subjected to such degrading and sub-human

28   treatment, which was magnified each time he was taken to the interrogation room.

1    Interrogators repeatedly threatened Mr. Sun that he would be similarly treated.

2                                    **The Notebook**

3         86.    Mr. Sun is informed and believes, and on that basis alleges, that

4    investigators belonging to TEAM 816 kept a notebook (the "Notebook"),

5    documenting their internal meetings and detailing the ENTERPRISE's efforts to

6    fabricate criminal charges and legitimize his imprisonment.

7         87.    On or about July 13, 2012, Mr. Sun received the Notebook from an

8    unknown third party in a FedEx-type envelope at his Hong Kong business offices.

9         88.    At a meeting on August 30, 2005, the Notebook indicated that

10   SINOPEC officials met with leading figures of TEAM 816 at Tingjin Hotel

11   (Changchun City, Jilin Province, PRC) to summarize their efforts against Mr. Sun

12   and to plan additional attempts to fabricate criminal charges against him.  Mr. Sun

13   is informed and believes, and on that basis alleges, that the following individuals

14   were present during this meeting: MR. ZHAO GANG, MR. WANG YU, MR.

15   WANG YANQIU, MR. YANG XUEFENG, MR. KANG NIUHU, MR. WU

16   JINZHU and four other representatives from SINOPEC, and other PRC law

17   enforcement officials.  The notes from this meeting reflect that TEAM 816's

18   primary objective was to "eliminate civil (lawsuit) risk."[8]

19        89.    On August 31, 2005, members of the ENTERPRISE participated in

20   another meeting with TEAM 816.  Mr. Sun is informed and believes, and on that

21   basis alleges, that MR. WU JINZHU, SINOPEC's then-Deputy Secretary of

22   Internal Affairs for its Beijing subsidiary, made a presentation about Mr. Sun at the

23   meeting, and that MR. ZHAO GANG and MR. LIU WEI discussed TEAM 816's

24   motivation to eliminate any claims related to the Pipeline Company's exclusive

25   rights to transport oil from the Tahe Oil Field.

26        90.    Specifically, the entry in the Notebook for the August 31, 2005,

27   meeting quotes MR. ZHAO GANG as reminding TEAM 816 members that "[i]n

28
_____
[8] Quotations from the Notebook come from a certified translation of the original Chinese script.

1  these few days, the people from Public Safety and SINOPEC need to sit down

2  together, organize things, and compare the details. . . . We need to be thorough on

3  Sun and make him the breakthrough point as soon as possible. . . . Need SINOPEC

4  to do preliminary works." As reflected in the Notebook, MR. WEI concurred, "The

5  end purpose is not to arrest people or to sentence people. Instead, it is to recuperate

6  state-owned assets."

7        91.    During this same meeting, MR. ZHAO stated "we need to have a plan

8  for interrogations. Non-stop for one or two days in order to nail him." MR. KANG

9  agreed, instructing MR. WEI and MR. GANG "let's do it non-stop."

10        92.    The ENTERPRISE's control of Mr. Sun's detention and the

11  dismantling of his businesses are reflected throughout the entries in the Notebook.

12        93.    In one entry, a TEAM 816 member commented, "SINOPEC needs to

13  have a general team for job-related crimes." This appears to have prompted another

14  meeting attendee to comment that SINOPEC "can send two people to assist our

15  audit in Jilin. It needs to be well prepared, so that we achieve the goal once we do

16  it the first time. Comrades from SINOPEC have been discussing the materials with

17  us these days, to determine the content of interrogations. Wang Yu is to dispatch

18  the people from SINOPEC to each team" of interrogators. MR. WANG YU agreed

19  to do so, commenting that "SINOPEC is looking for problems" and that police

20  investigators are to "raise the issues that" SINOPEC "wants to investigate." MR.

21  LIU WEI then replied that "SINOPEC coordinates with the Central Disciplinary

22  Commission . . . . Both work at it at the same time."

23        94.    SINOPEC personnel in the ENTERPRISE were so extensively

24  involved in the day-to-day investigation of Mr. Sun that one TEAM 816 member

25  asked his superiors during one meeting whether it was "good to have the people

26  from SINOPEC to do the case using our name?" A supervisor responded that,

27  "SINOPEC's personnel involved in handling this case must not let others know.

28  Observe the reactions now. There are rules and laws, and just say they are our

1    people to the outside people."

2         95.    The ENTERPRISE's, including personnel of SINOPEC, entrenched

3    involvement in directing the investigation did not go unnoticed by other TEAM 816

4    members. One participant at a TEAM 816 meeting warned those in attendance that

5    "[i]t might cause problems if people from SINOPEC get involved in the handling of

6    the case."

7         96.    Mr. Sun is informed and believes, and on that basis alleges, that

8    SINOPEC regularly paid extravagant sums to TEAM 816 members for their efforts

9    pertaining to Mr. Sun. Indeed, the Notebook reflects that MR. WANG YU

10   reminded TEAM 816 members that "no matter how much money SINOPEC has

11   given us, we cannot spend it extravagantly. Don't overspend on shopping, dining

12   out, drinking, and entertainment."

13        97.    The tenor of the Notebook's entries soured in 2006 as TEAM 816

14   members were unable to find a legitimate basis to continue to detain Mr. Sun. The

15   ramification was not lost on the members. One participant commented, "If we can

16   just nail one down, it would be a humongous case, and that is also a big

17   accomplishment made for the Party and the Province. It will be a very beautiful

18   battle politically, and we will have things to present to various levels of leadership.

19   SINOPEC paid money and also gave people to us, and we are able to repay their

20   favor."

21        98.    Another TEAM 816 member lamented, "It seems now that the

22   investigation is not very optimistic. Things we need to present are very different

23   from realities. Many of the evidence that we thought had no problems turned out to

24   be incorrect after investigation, and many of the materials provided were not true.

25   A majority of them is imagination or issues they want to raise. Sun Tiangang is a

26   very down to earth person, and he does not spend much money dining out or

27   drinking and he does not smoke or drink. He does not have any bad habits. It is

28   really difficult." Despite these admissions that Mr. Sun had not committed a crime,

1    Mr. Sun was not released from the detention facility.

2         99.    On July 3, 2006, another TEAM 816 member similarly commented

3    during a meeting: "Sun Tiangang's case, now we see it, it is somewhat difficult to

4    investigate and obtain evidence, as we have not discovered any strong evidence yet.

5    Most of them cannot be verified, no matter if they are alleged by SINOPEC or

6    reported by others.  The materials provided have too much false information, and

7    many of them are too far-fetched and difficult to determine.  It is difficult to convict

8    him."

9         100.   At the same meeting, TEAM 816 member MR. WANG YU criticized

10   the ineptitude of the investigation, commenting that "Sun Tiangang's case, there is

11   no strong evidence yet as of now.  This won't work. Some people don't know how

12   to continue the investigation the more they investigate."

13        101.   MR. WANG ZHONGXING followed up, observing that "the money

14   of [National Star's former-chairman] Zhu Jiazhen and Sun Tiangang and their

15   businesses, it is hard to distinguish between personal and company accounts?  Even

16   if they put their personal expenses into their companies, to make it a crime requires

17   hard thinking."

18        102.   The difficulties in contriving a legitimate basis to continue to detain

19   Mr. Sun only brought in sharper focus TEAM 816's true objective and the

20   importance of that objective to their ENTERPRISE benefactors.  At a meeting in

21   September 10, 2006, MR. WANG YU commented, "We are entering a difficult

22   period in Sun Tiangang's case.  We need to unite and make efforts together and

23   make it through the difficulties.  We must continue the 816 case.  Everything is to

24   be conducted as normal."  MR. ZHAO reiterated those points and reminded TEAM

25   816 about the importance of finding any basis to convict Mr. Sun:

26
27              It is impossible that Sun Tiangang does not have anything
               illegal.  No one does things perfectly legally.  We must
28              investigate it out, otherwise, we cannot give an answer. . .
               . Everyone in the province knows about this case in the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES                                          - 22 -

last few years, and it has huge social effect. If Sun Tiangang is innocent, we will be in trouble, and the consequences are unimaginable. . . . We would not be able to give an answer to the central government, nor to the people of the entire province. The 816 case must have a conviction. SINOPEC spent so much money and resources, and we would not be able to give an answer to SINOPEC. Let's do work from multiple directions, and a conviction is a must. This is politics, for the stability of the society, for the image of the justice system of the country and the Party. We must convict Sun Tiangang.

**Confiscation of Mr. Sun's Businesses, Personal Property, and Other Assets**

103.   In furtherance of its scheme, the ENTERPRISE directed TEAM 816 to conduct an extensive investigation of Mr. Sun's family. The investigation ultimately caused Mr. Sun's wife and young daughter to flee their home and hide in the countryside for several years. During this time, the ENTERPRISE caused Mr. Sun's family bank accounts to be frozen, his assets seized, and his homes and properties confiscated. Mr. Sun is informed and believes, and on that basis alleges, that even the clothes and personal belongings left in his house after his family fled were seized by TEAM 816 members at the direction of the ENTERPRISE.

104.   The ENTERPRISE's conduct also took a grave psychological and emotional toll on Mr. Sun's family, as his young daughter was forced to stop attending school for a long period of time and had limited social contact with her peers. Furthermore, Mr. Sun's wife and young daughter lived in fear for both their own safety and that of Mr. Sun.

105.   Entries in the Notebook reflect the ENTERPRISE's seizures of Mr. Sun's personal belongings. In one entry a participant cautioned attendees that, "[w]e need to be careful about the safekeeping of some of the items. Items detained from GeoMax also need to be carefully managed. The vehicles were driven home by private people for a long time. We should not spend SINOPEC's money extravagantly, and buying everything new. Individuals should not request for money from SINOPEC at will."

106.   Before the ENTERPRISE seized Mr. Sun's assets, Mr. Sun's

1   businesses and properties were valued in excess of one billion dollars.  Mr. Sun's

2   portfolio included the GEHC entities and their subsidiaries and various other

3   companies.  Mr. Sun's portfolio also included personal property (cars, equipment,

4   machinery, and other vehicles) and real property (offices, apartment buildings, and

5   land).

6       107.   Mr. Sun is informed and believes, and on that basis alleges, that the

7   ENTERPRISE caused nearly all of Mr. Sun's property to be sold to, "requisitioned"

8   by, or given to persons involved in the raids or their family members, to

9   "compensate" the members of TEAM 816, the PRC, and other parties that

10  participated in the scheme to have the Beijing Lawsuit dismissed and maintain as

11  secret SINOPEC's misleading and false public statements regarding the Tahe Oil

12  Fields.

13      108.   Specifically, Mr. Sun is informed and believes, and on that basis

14  alleges, that the ENTERPRISE caused Mr. Sun's ownership interests in the

15  following businesses to be seized and either sold at public auction or illegally

16  transferred to others:

17          a.    GEHC, worth at least $165 million; and

18          b.    XinJiang XingMei Oil Pipeline Co., Ltd., worth at least $5

19                billion.

20              **The First Indictment Against Mr. Sun**

21      109.   On or about December 19, 2007, the PRC Procurate of Changchun

22  City indicted Mr. Sun (the "First Indictment") for contract fraud, false capital

23  contributions, embezzlement, and bribery.  Mr. Sun is informed and believes, and

24  on that basis alleges, that the First Indictment was based entirely on allegations

25  concocted by TEAM 816, SINOPEC, and SINOPEC's agents.

26      110.   On or about March 18, 2008, the case against Mr. Sun proceeded to

27  trial.  Throughout the trial, SINOPEC officials directed the Procurator's office in

28  the conduct of the trial, communicated with the judge overseeing the criminal

1   proceedings, and attempted to improperly influence the outcome of the trial.

2       111.   Notwithstanding SINOPEC's efforts, the evidence contrived by

3   TEAM 816 as part of the ENTERPRISE did not withstand even this non-existent

4   judicial scrutiny.  The Procurator ultimately withdrew the First Indictment,

5   effectively dismissing the criminal charges against Mr. Sun.  Yet, Mr. Sun was not

6   released from the detention facility.

7       112.   Mr. Sun is informed and believes, and on that basis alleges, that the

8   ENTERPRISE used its corrupt influence and relationships within the PRC

9   government to direct PRC law enforcement authorities to continue detaining Mr.

10  Sun, and also to direct the presiding judge to refrain from issuing any verdict

11  exonerating Mr. Sun.  This effectively allowed the ENTERPRISE to make another

12  attempt at contriving a criminal conviction.

13                    **The Second Indictment Against Mr. Sun**

14      113.   Mr. Sun is informed and believes, and on that basis alleges, that, in

15  September, 2008, TEAM 816, as part of the ENTERPRISE, submitted materials

16  and purported evidence about Mr. Sun to PRC prosecutors.  Thereafter, TEAM 816

17  requested, once again, that criminal charges be brought against Mr. Sun.

18      114.   On November 5, 2008, the prosecutorial office issued a summary

19  report to the Procurator describing the basis for raising new criminal charges

20  against Mr. Sun (the "Charging Report").  The Charging Report noted that the

21  evidence was premised solely on reports from SINOPEC and that no other parties

22  or entities had evidence of criminal conduct by Mr. Sun.

23      115.   On January 4, 2009, the Procurator issued a second false and wholly

24  concocted indictment against Mr. Sun (the "Second Indictment") for embezzlement

25  and bribery.  The Second Indictment was based on the Charging Report and other

26  evidence contrived by the ENTERPRISE or at the ENTERPRISE's direction.

27      116.   In August 2009, a "trial" on the Second Indictment was conducted.

28  Here again, the ENTERPRISE furthered its scheme by actively assisting the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

1    Procurator's case and attempting to ensure a guilty verdict against Mr. Sun. Again,

2    even in a court process that was managed by the ENTERPRISE, the court would

3    not render a guilty verdict.

4         117.   Mr. Sun is informed and believes, and on that basis alleges, that the

5    ENTERPRISE again used its corrupt influence and relationships with the PRC

6    government to direct PRC government officials to continue detaining Mr. Sun, and

7    to have the presiding judge refrain from issuing a verdict exonerating Mr. Sun.

8                          **Continued Detention and Release**

9         118.   Consequently, Mr. Sun remained in a perpetual state of legal and

10   personal limbo for over 5 years.  Despite having been tried twice without having

11   been found guilty, he remained imprisoned in the detention facility where he was

12   unable to communicate with his family members, business colleagues, or the

13   outside world.  He also had limited access to his attorney.  Having nearly given up

14   all hope for his release, Mr. Sun stopped eating in protest and in despair of his

15   condition.  His health deteriorated.

16        119.   On or about September 25, 2010, Mr. Shi (a former Vice President at

17   GeoMax) died in detention.  On November 8, 2010, Mr. Sun was unexpectedly

18   released from the detention facility.  He was, though, still under probationary

19   "house arrest" and confined in a monitored apartment in Beijing.  His travel,

20   communications, and other activities were strictly limited.

21        120.   On March 6, 2012, court officials who had overseen Mr. Sun's second

22   criminal trial finally issued a decision – the charges against Mr. Sun were

23   withdrawn, and the Procurator decided not to continue to pursue charges against

24   him at that time.

25        121.   All told, Mr. Sun remained in detention from August 11, 2005 through

26   November 8, 2010, and house arrest from November 8, 2010 to March 6, 2012.

27        122.   At or about the time that Mr. Sun was released from house arrest, a

28   third party representative of Mr. Sun met with TEAM 816 member, MR. WANG

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1  YU, who by then had become Deputy Director of the Economic Crimes Division.

2  At that meeting , MR. WANG YU threatened to have Mr. Sun, his wife, and other

3  family members arrested if Mr. Sun brought legal action against SINOPEC and

4  TEAM 816 members.  MR. WANG YU also stated that TEAM 816 could

5  reactivate its case against Mr. Sun at any time, detain him again, and take measures

6  against him at their whim.

7  **Mr. Sun's Departure from PRC and the ENTERPRISE's Threats Directed to**

8  **the United States**

9      123.   Mr. Sun was permitted to leave Hong Kong for the United States on a

10  one-year B-1 Visa in November, 2012, but was not permitted to bring his wife and

11  young daughter.  To this date, Mr. Sun's wife and young daughter remain in the

12  PRC, where they live in fear of the ENTERPRISE.

13      124.   In November, 2012, Mr. Sun began consulting with counsel in the

14  United States to file a lawsuit regarding the loss of his businesses and associated

15  harms he had suffered.

16      125.   After his arrival in the United States, the ENTERPRISE learned that

17  Mr. Sun was contemplating filing a lawsuit to seek redress for his lost businesses

18  and the physical and emotional abuse he suffered at the hands of the

19  ENTERPRISE.  The ENTERPRISE was undeterred by the fact that Mr. Sun was

20  now in the United States, and once again pursued a scheme to prevent Mr. Sun

21  from taking legal action and sought to repatriate Mr. Sun to the PRC for detention.

22  To achieve that goal, the ENTERPRISE engaged in a course of conduct affecting

23  foreign commerce that included a pattern of racketeering activity involving

24  extortion, kidnapping, obstruction of justice, violation of the Hobbs Act (18 U.S.C.

25  § 1951), and violation of the Travel Act (18 U.S.C. § 1952).

26      126.   To  intimidate Mr. Sun, SINOPEC agents and PRC government

27  officials, as part of the ENTERPRISE, repeatedly contacted Mr. Sun while he was

28  in the United States, and threatened serious consequences against him and his

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1  family that would be similar to or worse than his prior detention, if Mr. Sun filed

2  the suit.  These threats escalated to a series of late-night break-ins by members of

3  the ENTERPRISE into Mr. Sun's business offices in Hong Kong and Shenzhen,

4  and his personal office in Beijing.  The perpetrators scoured his files for

5  information related to the contemplated litigation, and installed computer software

6  to monitor his communications with his legal counsel in the United States.

7    127.   In or about early December, 2012, while residing in California, Mr.

8  Sun received a telephone call from JOHN DOE NO. 2, stating that SINOPEC was

9  aware that he was considering pursuing legal action in the United States.  During

10  this call, Mr. Sun was told that SINOPEC officials and other members of the

11  ENTERPRISE had contacted PRC law enforcement officials about Mr. Sun's

12  litigation plans and that the ENTERPRISE was unleashing resources to insure Mr.

13  Sun did not file suit in the United States.

14    128.   In or about mid-December, 2012, while residing in California, Mr. Sun

15  received yet another telephone call from JOHN DOE NO. 2, stating that SINOPEC

16  planned to stop him from filing suit in the United States, and that SINOPEC

17  officials, as part of the ENTERPRISE, had directed PRC law enforcement agencies

18  to pursue action against Mr. Sun.  During this telephone call, JOHN DOE NO. 2,

19  advised that SINOPEC was aware of the legal steps that Mr. Sun was pursuing, and

20  threatened that continued efforts by Mr. Sun "would be harmful to you."

21    129.   In or about mid-February, 2013, while residing in California, Mr. Sun

22  received telephone calls from MR. AN, relaying to him that SINOPEC directed

23  PRC security officials to "reactivate the case against" him, that they "intend to

24  detain [him] again," and that SINOPEC officials were directed to "send its

25  employees, along with police, to find [him]."

26    130.   In or about late February, 2013, while residing in California, Mr. Sun

27  received a threatening telephone call from JOHN DOE NO. 2, who stated that

28  "SINOPEC has people in the United States who are planning to go out and find

1    you." During this telephone call Mr. Sun was told to "be careful," and to "pay

2    attention to your phone calls," implying that he was under constant threat and

3    surveillance, and that he was not physically safe in the United States.

4         131.  In late February, 2013, while residing in California, Mr. Sun received

5    numerous telephone calls from MR. AN in which MR. AN warned that "the police

6    are working with SINOPEC to harm you" and that Mr. Sun should "be careful,

7    SINOPEC wants to take your life."

8         132.  Eventually, the constant threats communicated to Mr. Sun while he

9    resided in California placed him in a desperate state.  He believed that members of

10   the ENTERPRISE were continuing to pursue him with full vigor, placing him in a

11   constant state of fear that he would again be detained by PRC government officials.

12   It was while in this desperate state that Mr. Sun was contacted by MR. AN in an

13   effort that, unbeknownst to Mr. Sun, was designed to lure him to Hong Kong to be

14   apprehended.

15   **Mr. Sun's Return Trip to Hong Kong and Pursuit by ENTERPRISE Members**

16        133.  In or about February, 2013, MR. AN telephoned Mr. Sun in California,

17   and voiced his personal concerns for Mr. Sun's situation.  Although such support

18   was illusory, Mr. Sun trusted MR. AN based on prior relations that the two had

19   from Mr. Sun's time in Hong Kong following his release from detention in 2012.

20   Indeed, at their initial meeting in Hong Kong in 2012, MR. AN told Mr. Sun that he

21   heard of the unfair treatment that Mr. Sun had endured, was generally familiar with

22   Mr. Sun's situation, and supported efforts to bring Mr. Sun's case to light.

23        134.  Based on these relations, Mr. Sun trusted MR. AN and believed he

24   could be an important ally in his dispute with SINOPEC.  In particular, Mr. Sun

25   was aware that MR. AN had business connections within SINOPEC and, as such,

26   might be able to influence SINOPEC to end its persecution of him.

27        135.  In February and March, 2013, MR. AN called Mr. Sun several times

28   while Mr. Sun was residing in California.  MR. AN told Mr. Sun he could arrange

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1  for him to be interviewed by Hong Kong-based reporters for the Singapore Straits

2  Times and the Wall Street Journal so that Mr. Sun could tell his story and expose

3  his mistreatment.  During these telephone conversations, MR. AN also stated he

4  could start a media campaign for Mr. Sun in Hong Kong, but that Mr. Sun would

5  need to return to Hong Kong to meet with reporters and to assist with the media

6  campaign.

7      136.   During these calls, MR. AN repeatedly assured Mr. Sun that the

8  meetings with the journalists would go smoothly and that he would ensure that his

9  travel to Hong Kong would be safe.

10      137.   At the time of these telephone conversations, Mr. Sun was under

11  incredible pressure from the repeated and ongoing threatening phone calls

12  described previously.  Mr. Sun was anxious for an avenue to expose the wrongs

13  perpetrated against him, and desperate to protect himself and his family from the

14  ENTERPRISE.  Moreover, because Mr. Sun was only temporarily residing in

15  California, he also realized he could essentially be forced to leave the United States

16  when his Visa expired and would face the real prospect of having to return to Hong

17  Kong permanently, placing himself and his family at further risk.  Thus, he was

18  desperate to find someone who could assist him.

19      138.   After much discussion, Mr. Sun relented and told MR. AN that he

20  would make the risky trip to Hong Kong to meet with the journalists.

21      139.   Mr. Sun arrived in Hong Kong from the United States on April 1,

22  2013.

23      140.   Despite his contrary assurances to Mr. Sun, MR. AN knew that Mr.

24  Sun would not be safe in Hong Kong.  Rather, MR. AN's communications with Mr.

25  Sun, done at the behest of the ENTERPRISE, sought to entice Mr. Sun to Hong

26  Kong so ENTERPRISE members could seize him.  In fact, upon information and

27  belief, a team of PRC law enforcement officials, including MR. WANG YU,

28  intended to detain Mr. Sun in Hong Kong.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

141.   Mr. Sun is informed and believes, and on that basis alleges, that MR. WANG YU led a PRC law enforcement team to Shenzhen province a few days before Mr. Sun's arrival in nearby Hong Kong, furthering the ENTERPRISE.

142.   Mr. Sun is informed and believes, and on that basis alleges, that after his arrival in Hong Kong, MR. WANG YU and the PRC law enforcement team crossed the border into Hong Kong, where they met with SINOPEC officials at the company's local office.

143.   On April 2, 2013, MR. JIN JIANYI contacted Mr. Sun, telling him that he had information about MR. ZHANG YUPING, the collaborating company official who took over GEHC and the Pipeline Company when Mr. Sun was imprisoned in the detention facility.

144.   MR. JIN JIANYI offered to meet at Mr. Sun's Hong Kong offices that afternoon to discuss this information.  Mr. Sun told MR. JIN JIANYI that he was too busy and offered to meet him the following day.

145.   On April 3, 2013, MR. AN told Mr. Sun that he made arrangements for him to meet a Singapore Straits Times journalist, but that the meeting would not take place until April 8, 2013.

146.   When Mr. Sun called MR. AN's business later that day to discuss moving up the meeting with the journalist, he was informed that MR. AN had left town and would not be back until April 8, 2013.

147.   That same day, Mr. Sun received reports that Hong Kong police was accompanying the PRC law enforcement team in Hong Kong looking for him, and that his apprehension by them was imminent.  Mr. Sun then realized that he had been deceived by MR. AN and lulled into a trap.

148.   Concerned for his personal safety and liberty, Mr. Sun arranged to leave Hong Kong that evening.

149.   That afternoon MR. JIN JIANYI called Mr. Sun and invited him to dinner, proposing to meet at Mr. Sun's Hong Kong offices.  On information and

1   belief, MR. JIN JIANYI was attempting to further lure Mr. Sun into the trap,

2   leading him to a location where MR. WANG YU and the PRC law enforcement

3   team could apprehend Mr. Sun, bringing the ENTERPRISE's plan to fruition.  Mr.

4   Sun recognized this ploy and, while agreeing to the proposal as a means of buying

5   time for escape, continued to the airport.

6          150.   While in a taxi cab fleeing to the airport, Mr. Sun received yet another

7   telephone call from MR. JIN JIANYI, reminding him of Mr. Sun's commitment to

8   attend their supposed "dinner."

9          151.   Instead, Mr. Sun safely flew back to the United States.

10         152.   Shortly after Mr. Sun arrived back in California, he received a

11  telephone call from MR. JIN JIANYI, asking where he was due to Mr. Sun's non-

12  appearance at the "dinner." When Mr. Sun told him he was back in the United

13  States, MR. JIN JIANYI responded, "So you escaped?"

14         153.   Mr. Sun arrived in California on April 5, 2013.  April 4th is Ancestor's

15  Day in Hong Kong, a holiday during which office buildings are closed.  Based on

16  the time change between Hong Kong and the United States, Mr. Sun's escape from

17  Hong Kong and his arrival in California corresponded roughly with the 24- to 48-

18  hour Ancestor's Day holiday period in Hong Kong.

19         154.   On April 5, 2013, the office assistant at Mr. Sun's Hong Kong office

20  received a voice message from the office building's security department, advising

21  that the office door was open.  The telephone call was received during the

22  Ancestor's Day holiday while Mr. Sun's business office was closed.  That the

23  office door was open was extremely troubling and confusing news, since the

24  assistant had locked the office prior to leaving for the holiday on April 3 and no

25  other person had access to the office, nor had it been opened by any office

26  employees.  Furthermore, Mr. Sun's Hong Kong office has a double-door entrance,

27  with separate locks and keys for each door.  The assistant and all other office

28  employees have keys only for the left-side door, but the door that was opened was

1    the right-side door.  The door was therefore opened late at night on April 3, 2013,

2    which coincides with the time for the "dinner" with MR. JIN JIANYI.

3         155.   Mr. Sun is informed and believes, and on that basis alleges, that MR.

4    JIN JIANYI and PRC law enforcement broke into Mr. Sun's Hong Kong office late

5    on the night of April 3, 2013, with the intent to locate and detain Mr. Sun.

6    **ENTERPRISE's Threats Increase upon Mr. Sun's Return to United States**

7         156.   On April 7, 2013, after his return to California, Mr. Sun received a

8    telephone call from JOHN DOE NO. 2, warning that "Beijing has decided to act

9    against you."

10        157.   From April 12, 2013 through May, 2013, Mr. Sun received numerous

11   calls while he was in California from JOHN DOE NO. 2 and others, who advised

12   him that SINOPEC's Chairman, MR. FU CHENGYU, was in New York City.  In

13   these telephone calls, Mr. Sun was repeatedly warned that SINOPEC's Chairman

14   was speaking with the company's United States counsel, that they had devised a

15   plan to stop him.  Moreover, JOHN DOE NO. 2 warned Mr. Sun that SINOPEC

16   was sending someone to California "to get him."  JOHN DOE NO. 2 further

17   warned Mr. Sun that his presence in the United States would not guarantee his

18   safety nor that of family members who remained in the PRC.

19        158.   While in California, Mr. Sun received a call at 2:00 a.m. on April 19,

20   2013, by JOHN DOE NO. 1, who warned Mr. Sun to be "very careful.  What you

21   are doing in the United States.  You should think twice, don't file a lawsuit.  If you

22   do anything then you will be an enemy of the state."  JOHN DOE NO. 1 also told

23   Mr. Sun that it was important for Mr. Sun to return to Hong Kong, asked where Mr.

24   Sun was now, whether he was coming back anytime soon, and said he would like to

25   meet him.

26        159.   On April 27, 2013, MR. AN telephoned Mr. Sun in California, seeking

27   to elicit details of Mr. Sun's contemplated lawsuit.  At one point during the

28   conversation, MR. AN confessed that he had used Mr. Sun as a bargaining chip in

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 33 -

1    his (MR. AN's) dispute with SINOPEC.  At the end of the conversation, MR. AN

2    informed Mr. Sun that he was planning to travel to Beijing and asked if Mr. Sun

3    had any message he wanted him to deliver to SINOPEC.

4         160.   Mr. Sun is informed and believes, and on that basis alleges, that at the

5    same time the gravity of the personal threats was increasing, the ENTERPRISE

6    began systematically breaking into his businesses and personal offices.

7         161.   On or about June 12, 2012, Mr. Sun was contacted by personnel

8    regarding a break-in at his Beijing office.  The break-in occurred during the

9    "Dragon Boat Festival," a national holiday in the PRC.  It is customary for

10   employees to be away from work on this holiday.  Following the holiday, office

11   employees discovered that the entrance door lock had been tampered with and was

12   difficult to operate.  Inspection revealed markings in and around the metal lock,

13   showing signs that the office had been accessed covertly.  Further inspection of the

14   office revealed that file cabinets were open and files had been rearranged.

15   Additionally, employees discovered that the office's Internet network router had

16   been tampered with, that the personal computers in the office had been accessed, an

17   unidentified keylogger-type software had been installed, and the data on the

18   computers was possibly imaged.  Importantly, the Beijing office held Mr. Sun's

19   case file, legal papers and communications with his United States counsel related to

20   his contemplated lawsuit in the United States.

21        162.   A building surveillance tape of the Beijing office showed three men

22   wearing PRC law enforcement uniforms entering the Beijing office late at night

23   during the Dragon Boat Festival.  The three PRC law enforcement officials did not

24   appear again on the surveillance tape until 6 a.m. the next day, when they were

25   shown exiting the office.

26        163.   Earlier in June, 2013, Mr. Sun was told by a business colleague that

27   Mr. Sun's Shenzhen office had also been broken into and its contents combed

28   through.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

164.   On June 16, 2013, MR. AN contacted Mr. Sun's business colleague and his PRC criminal defense attorney upon their return to the PRC following a trip to the United States.  During their trip to the United States both men had met with Mr. Sun regarding the ENTERPRISE's ongoing actions against him.

165.   During this meeting with MR. AN, Mr. Sun's business colleague and PRC criminal defense attorney were told that Mr. Sun's telephone conversations in the United States were being monitored and/or "wire-tapped" by SINOPEC and that JOHN DOE NO. 2 personally "had copies of his conversations on [his] office desk."  MR. AN again threatened that Mr. Sun should not pursue litigation against SINOPEC and that SINOPEC asked that he communicate this to Mr. Sun.  MR. AN also threatened to have one of Mr. Sun's remaining business assets – Xin Ji Mei, a natural gas pipeline company commonly referred to as New Jimei– auctioned if Mr. Sun did not cease pursuing litigation in the United States.  MR. AN claimed that his failure to do so would cause Mr. Sun to be "an enemy of the People's Republic of China."

166.   Later in June, 2013, MR. AN telephoned Mr. Sun in California, threatening that if he did not settle the case with SINOPEC, it would proceed with auctioning-off Mr. Sun's New Jimei natural gas pipeline company.

167.   On June 24, 2013, MR. AN telephoned Mr. Sun, while he was in California, and again advised him not to pursue legal action in the United States. During this phone call, MR. AN gave a foreboding "reminder" to Mr. Sun that his wife, daughter, and other family members reside in the PRC.  MR. AN thereby indicated that Mr. Sun's wife and young daughter were not safe and that the ENTERPRISE might detain and/or physically harm them as a means to compel an end to the threatened litigation in the United States and also force Mr. Sun's return to Hong Kong or PRC.

168.   On July 21, 2013, JOHN DOE NO. 2 telephoned Mr. Sun, warning him that going forward with the litigation in the United States would put at risk the

1  safety of his niece, who is a United States citizen residing in California.

2      169.   As a result of these threats, Mr. Sun has incurred expense, delays and

3  inconvenience in pursuing his originally contemplated lawsuit, including the need

4  to hire a private security firm and take other measures to safeguard his person and

5  that of his family.

6                          **FIRST CLAIM FOR RELIEF**

7                           **(Alien Tort Claims Act)**

8                              **28 U.S.C. § 1350**

9  **Attempted Torture, Cruel, Inhuman or Degrading Treatment, and Arbitrary**

10                         **Arrest and Detention**

11     170.   The allegations set forth in paragraphs 1 through 170 of this Complaint

12  are realleged and incorporated by reference as if fully set forth herein.

13     171.   The acts described herein constitute a violation of the Alien Tort

14  Claims Act, customary international law, and the common law of the United States.

15     172.   SINOPEC's conduct violates the following international laws,

16  agreements, conventions, resolutions and treaties:

17     •   Universal Declaration of Human Rights, General Assembly Res. 217A

18         (iii), U.N. Doc. A/810 (1948)

19     •   International Covenant on Civil and Political Rights, General

20         Assembly Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at

21         52, U.N. Doc. A/6316 (1966)

22     •   Convention Against Torture and Other Cruel , Inhuman or Degrading

23         Treatment or Punishment, General Assembly Res. 39/46, 39 U.N.

24         Doc., GAOR Supp. (No. 51) at 1100, U.N. Doc. A/39/51 (1984)

25     •   Declaration on the Protection of All Persons From Being Subjected to

26         Torture and  Other Cruel, Inhuman or Degrading Treatment or

27         Punishment, General Assembly Res. 3452, 30 U.N. Doc., GAOR

28         Supp. (no. 34) at 91, U.N. Doc. A/10034 (1976)

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

173.   The acts described herein constitute an attempt to torture Mr. Sun, and to do so deliberately and intentionally for purposes that include punishing Mr. Sun for planning to file a lawsuit in the United States and intimidating Mr. Sun into refraining from making public in the United States certain facts regarding SINOPEC's false and misleading statements regarding its Tahe Oil Field operations and PRC's government officials' complicity in SINOPEC'S conduct.

174.   The acts described herein constitute an attempt to commit cruel, inhuman or degrading treatment with the intent and the effect of grossly humiliating and debasing Mr. Sun, inciting fear and anguish, and breaking physical or moral resistance.  The acts were further intended to force Mr. Sun and his family to refrain from making public in the United States SINOPEC's false and misleading statements regarding its Tahe Oil Field operations and PRC's government officials' complicity in SINOPEC's conduct.

175.   The acts described herein constitute an attempt to bring about the arbitrary arrest and detention of Mr. Sun.  As a result of these acts, Mr. Sun was placed in fear of his life, the loss of his freedom, and separation from his family, and was also placed in fear of being subjected to severe physical and mental abuse, for purposes that include punishing Mr. Sun for planning to file a lawsuit in the United States and intimidating Mr. Sun into refraining from making public in the United States certain facts regarding SINOPEC's false and misleading statements regarding its Tahe Oil Field operations and PRC's government officials' complicity in SINOPEC'S conduct.

176.   As a result of SINOPEC's actions, Mr. Sun suffered harm and injury.

177.   SINOPEC is liable for the said conduct in that it and its agents conspired with PRC security forces to attempt to arbitrarily detain and torture Mr. Sun, and to bring about the attempt to cause the cruel, inhuman or degrading treatment of Mr. Sun.

**SECOND CLAIM FOR RELIEF**

**(Alien Tort Claims Act)**

**28 U.S.C. § 1350**

**Commission of Torture, Cruel, Inhuman or Degrading Treatment, and**

**Arbitrary Arrest and Detention**

**(Continuing Tort Theory)**

178. The allegations set forth in paragraphs 1 through 170 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

179. The acts described herein constitute a violation of the Alien Tort Claims Act, customary international law, and the common law of the United States.

180. SINOPEC's conduct violates the following international laws, agreements, conventions, resolutions and treaties:

- Universal Declaration of Human Rights, General Assembly Res. 217A(iii), U.N. Doc. A/810 (1948)

- International Covenant on Civil and Political Rights, General Assembly Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966)

- Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, General Assembly Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. Doc. A/39/51 (1984)

- Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, General Assembly Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976)

181. The acts described herein constitute a continuing tort of torture that began in the PRC and crossed into the United States. The acts were done deliberately and intentionally for purposes that included punishing Mr. Sun for pursuing his legal rights and intimidating Mr. Sun into refraining from making

1  public certain facts regarding SINOPEC's false and misleading statements

2  regarding its Tahe Oil Field operations and PRC's government officials' complicity

3  in SINOPEC's conduct.

4       182.  The acts described herein began in the PRC and crossed into the

5  United States and constitute a continuing tort of cruel, inhuman or degrading

6  treatment, with the intent and the effect of grossly humiliating and debasing Mr.

7  Sun, forcing him to act against his will and conscience, inciting fear and anguish,

8  and breaking physical or moral resistance.  The acts were further intended to force

9  Mr. Sun and his family to remain silent about SINOPEC's false and misleading

10  statements regarding its Tahe Oil Field operations and PRC's government officials'

11  complicity in SINOPEC's conduct.

12       183.  The acts described herein began in the PRC and crossed into the

13  United States and constitute a continuing tort of arbitrary arrest and detention.  This

14  conduct caused Mr. Sun to fear for his life, loss of his freedom, and separation from

15  his family.  He further feared being subjected to severe physical and mental abuse.

16       184.  As a result of SINOPEC's actions, Mr. Sun suffered harm and injury.

17       185.  SINOPEC is liable for the said conduct in that it and its agents

18  directed, ordered, confirmed, and/or ratified with PRC security forces in bringing

19  about the torture, the cruel, inhuman or degrading treatment, and arbitrary arrest

20  and detention of Mr. Sun.

21                        **THIRD CLAIM FOR RELIEF**

22     **(Violations of the Racketeer Influenced and Corrupt Organizations Act)**

23                       **18 U.S.C. § 1962(c)**

24       186.  The allegations set forth in paragraphs 1 through 170 of this Complaint

25  are realleged and incorporated by reference as if fully set forth herein.

26       187.  From 2005 to the present, the ENTERPRISE's arrangement described

27  herein constitutes an ongoing organization, with an ascertainable structure and

28  purpose beyond the predicate acts and the conspiracy to commit such acts, by

which SINOPEC personnel, SINOPEC's agents, PRC law enforcement officials, MR. DAVID AN, MR. JIN JIANYI, MR. ZHANG YUPING, MRS. XING XIAOJING and JOHN DOE NOS. 1 and 2 function as a continuing unit comprised of the same.

188.    Alternatively, SINOPEC personnel, SINOPEC's agents, PRC law enforcement officials, MR. DAVID AN, MR. JIN JIANYI, MR. ZHANG YUPING, MRS. XING XIAOJING and JOHN DOE NOS. 1 and 2 constituted an association in fact for a common purpose with a continuous existence separate and apart from the pattern of racketeering activity in which they engaged.  This association in fact constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

189.    SINOPEC personnel, SINOPEC's agents, PRC law enforcement officials, MR. DAVID AN, MR. JIN JIANYI, MR. ZHANG YUPING, MRS. XING XIAOJING and JOHN DOE NOS. 1 and 2, associated themselves with each other to form the ENTERPRISE for the purpose of maintaining as secret SINOPEC's systematic issuance of false and misleading public statements regarding its Tahe Oil Field operations and PRC law enforcement officials' complicity in maintaining that secret.

190.    The ENTERPRISE is engaged in foreign or interstate acts of commerce and the acts alleged herein have a potential effect on foreign commerce, or interstate commerce in the United States.

191.    At all times relevant to this Complaint, SINOPEC conducted or participated directly or indirectly in the conduct of the affairs of the ENTERPRISE through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(1)(5), in violation of 18 U.S.C. § 1962(c).

192.    The pattern of racketeering activity alleged above included the following specific acts, all of which constituted and are defined as racketeering activity by 18 U.S.C. § 1961(1) and all of which are set forth in the specific

numbered paragraphs herein which are realleged and incorporated here by reference as if fully set forth, as follows:

a)  extortion;
b)  kidnapping;
c)  Hobbs Act, 18 U.S.C. § 1951;
d)  obstruction of justice, 18 U.S.C. § 1503; and
e)  Travel Act, 18 U.S.C. § 1952.

193.   SINOPEC engaged in extortion by conspiring to obtain Mr. Sun's relinquishment of his property right to pursue legal remedies against it in the United States through the wrongful use of force or fear of harm to Mr. Sun, his family, and his businesses.

194.   SINOPEC engaged in kidnapping by conspiring to have Mr. Sun brought through false promises and false pretenses from California to Hong Kong where he would then be detained against his will without legal cause.

195.   SINOPEC engaged in obstruction of justice by conspiring through threats of force and threatening communications to Mr. Sun endeavoring to obstruct the due administration of justice by preventing Mr. Sun from filing a lawsuit against it.

196.   SINOPEC engaged in violations of the Hobbs Act and Travel Act by conspiring to threaten Mr. Sun with violence to his person or property, and through the use of a facility of commerce promoted, managed, established, carried on and/or facilitated threats of violence to Mr. Sun's person and property.

197.   The object of these predicate acts was to silence Mr. Sun from making public the false and misleading public statements SINOPEC had systematically made regarding its Tahe Oil Field operations.  The acts' further purpose was to dissuade Mr. Sun from instituting a lawsuit in the United States.

198.   As a direct and proximate result of SINOPEC's violations of 18 U.S.C. § 1962(c), Mr. Sun has suffered injuries to his business and property in an amount to be determined at trial.

199.   The injuries suffered by Mr. Sun were reasonably foreseeable or

1   anticipated by SINOPEC as the natural consequence of its acts.

2   **FOURTH CLAIM FOR RELIEF**

3   **(Violations of the Racketeer Influenced and Corrupt Organizations Act)**

4   **18 U.S.C. § 1962(d)**

5   200.   The allegations set forth in paragraphs 1 through 170 of this Complaint

6   are realleged and incorporated by reference as if fully set forth herein.

7   201.   From 2005 to the present, SINOPEC personnel, SINOPEC's agents,

8   PRC law enforcement officials, MR. DAVID AN, MR. JIN JIANYI, MR. ZHANG

9   YUPING, MRS. XING XIAOJING and JOHN DOE NOS. 1 and 2 formed a RICO

10   "enterprise" within the meaning of 18 U.S.C. § 1961(4) engaged in foreign and

11   interstate commerce.

12   202.   Alternatively, SINOPEC personnel, SINOPEC's agents, PRC law

13   enforcement officials, MR. DAVID AN, MR. JIN JIANYI, MR. ZHANG

14   YUPING, MRS. XING XIAOJING and JOHN DOE NOS. 1 and 2 constituted an

15   association in fact for a common purpose with a continuous existence separate and

16   apart from the pattern of racketeering activity in which they engaged.  This

17   association in fact constituted an enterprise within the meaning of 18 U.S.C. §

18   1961(4).

19   203.   Each participant in the ENTERPRISE is an "individual or entity

20   capable of holding a legal or beneficial interest in property" and, as such, each

21   constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

22   204.   The ENTERPRISE is engaged in foreign and interstate acts of

23   commerce.  The acts alleged herein have a potential effect on foreign commerce

24   and interstate commerce in the United States.

25   205.   SINOPEC agreed and conspired to violate 18 U.S.C. § 1962(c).

26   206.   SINOPEC has intentionally conspired and agreed to directly and

27   indirectly conduct and participate in the conduct of the affairs of the ENTERPRISE

28   through a pattern of racketeering activity.  SINOPEC knew that its predicate acts

1  were part of a pattern of racketeering activity and agreed to the commission of

2  those acts to further the scheme.  That conduct constitutes a conspiracy to violate 18

3  U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

4      207.  In furtherance of the conspiracy, and to affect the objects thereof,

5  SINOPEC committed overt acts as set forth more fully in paragraphs 1 through 170.

6      208.  The pattern of racketeering activity alleged above included the

7  following specific acts, all of which constituted and are defined as racketeering

8  activity by 18 U.S.C. § 1961(1) and all of which are set forth in the specific

9  numbered paragraphs herein which are realleged and incorporated here by reference

10  as if fully set forth, as follows:

11      a)  extortion;
    b)  kidnapping;

12      c)  Hobbs Act, 18 U.S.C. § 1951;
    d)  obstruction of justice, 18 U.S.C. § 1503; and

13      e)  Travel Act, 18 U.S.C. § 1952.

14      209.  SINOPEC engaged in extortion by conspiring to obtain Mr. Sun's

15  relinquishment of his property right to pursue legal remedies against it in the United

16  States through the wrongful use of force or fear of harm to Mr. Sun, his family, and

17  his businesses.

18      210.  SINOPEC engaged in kidnapping by conspiring to have Mr. Sun

19  brought through false promises and false pretense from California to Hong Kong

20  where he would then be detained against his will without legal cause.

21      211.  SINOPEC engaged in obstruction of justice by conspiring through

22  threats of force and threatening communications to Mr. Sun, endeavoring to

23  obstruct the due administration of justice by preventing Mr. Sun from filing a

24  lawsuit against it.

25      212.  SINOPEC engaged in violations of the Hobbs Act and Travel Act by

26  conspiring to threaten Mr. Sun with violence to his person or property, and through

27  the use of a facility of commerce promoted, managed, established, carried on and/or

28  facilitated threats of violence to Mr. Sun's person and property.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 43 -

213.   The object of these predicate acts was to silence Mr. Sun from making public the false and misleading public statements SINOPEC had systematically made regarding its Tahe Oil Field operations.  The acts' further purpose was to dissuade Mr. Sun from instituting a lawsuit in the United States.

214.   As a direct and proximate result of SINOPEC's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Mr. Sun has been injured in his business and property in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

215.   The allegations set forth in paragraphs 1 through 170 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

216.   The acts described herein constitute outrageous conduct in violation of all normal standards of decency and were without privilege or justification.

217.   These outrageous acts were intentional and malicious and committed for the purposes of causing Mr. Sun to suffer humiliation, mental anguish, and extreme emotional and physical distress.

218.   As a result of SINOPEC's acts, Mr. Sun was placed in great fear for his life and liberty, and was forced to suffer severe and extreme psychological abuse, distress and agony.

219.   SINOPEC is liable for the said conduct in that defendants directed, ordered, confirmed, ratified, and/or conspired with PRC security forces in bringing about the intentional infliction of emotional distress of Mr. Sun.

220.   SINOPEC's outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of California.

## SIXTH CLAIM FOR RELIEF
### (Negligent Infliction of Emotional Distress)

221.   The allegations set forth in paragraphs 1 through 170 of this Complaint

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

are realleged and incorporated by reference as if fully set forth herein.

222.   The actions of SINOPEC constituted a negligent infliction of emotional distress upon Mr. Sun.

223.   SINOPEC carelessly and negligently inflicted said emotional distress through a wanton and reckless campaign of harassment and intimidation.

224.   SINOPEC is liable for the said conduct in that it directed, ordered, confirmed, ratified, and/or conspired with the PRC security forces in bringing about the negligent infliction of emotional distress of Mr. Sun.

225.   As a direct and legal result of SINOPEC's wrongful acts, Mr. Sun has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.

226.   SINOPEC's conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of California.

## SEVENTH CLAIM FOR RELIEF

### (Assault)

227.   The allegations set forth in paragraphs 1 through 170 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

228.   SINOPEC placed Mr. Sun in immediate and great fear of severe bodily harm or death without any just provocation or cause.

229.   At no time did Mr. Sun consent to any of the acts of SINOPEC alleged above.

230.   SINOPEC's conduct was neither privileged nor was there any just cause for the conduct under statute or common law.

231.   As a result of these acts, Mr. Sun suffered severe psychological abuse, distress and agony.  SINOPEC's acts were willful, intentional, wanton, malicious and oppressive.

232.   SINOPEC is liable for said conduct in that it directed, ordered, confirmed, ratified, and/or conspired with the PRC security forces in bringing about

1   the assault of Mr. Sun.

2      233.   The acts described herein constitute assault, actionable under the laws

3   of California.

## EIGHTH CLAIM FOR RELIEF

### (False Imprisonment)

6      234.   The allegations set forth in paragraphs 1 through 170 of this Complaint

7   are realleged and incorporated by reference as if fully set forth herein.

8      235.   Mr. Sun was seized, maliciously and without a warrant, when Mr. Sun

9   had not committed any crime or public offense.

10     236.   SINOPEC accused Mr. Sun of committing criminal offenses, but in

11  fact those offenses had not occurred, nor did SINOPEC have probable cause to

12  believe that said offenses had occurred or that Mr. Sun had committed said

13  offenses.

14     237.   SINOPEC intentionally caused Mr. Sun to be falsely imprisoned and

15  arrested without justification or probable cause, where he remained detained for the

16  next five years.

17     238.   SINOPEC intentionally caused Mr. Sun to be falsely detained under

18  house arrest without probable cause, where he remained detained for the next two

19  years.

20     239.   As a result of these acts, Mr. Sun suffered damages.

21     240.   SINOPEC's conduct was willful, wanton, malicious and oppressive.

22     241.   The acts described herein constitute false imprisonment, actionable

23  under the laws of California.

## NINTH CLAIM FOR RELIEF

### (Malicious Prosecution)

26     242.   The allegation set forth in paragraphs 1 through 170 of this Complaint

27  are realleged and incorporated by reference as if fully set forth herein.

28     243.   SINOPEC was actively involved in causing Mr. Sun to be prosecuted

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 46 -

1   in criminal proceedings.

2        244.   Those criminal proceedings ended in Mr. Sun's favor.

3        245.   No reasonable person in SINOPEC's circumstances would have

4   believed that there were grounds for causing Mr. Sun to be arrested or prosecuted,

5   particularly after the first trial resulted in the dismissal of all charges.

6        246.   SINOPEC acted primarily for a purpose other than to bring Mr. Sun to

7   justice.

8        247.   Mr. Sun was harmed by SINOPEC's conduct, which was a substantial

9   factor in causing that harm.

10        248.   SINOPEC's conduct was willful, malicious, and oppressive.

11        249.   The acts described herein constitute malicious prosecution, actionable

12   under the laws of California.

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 47 -

1

## PRAYER FOR RELIEF

2      WHEREFORE, Mr. Sun prays for relief and judgment against defendant

3   SINOPEC as follows:

4

5   (a)   for compensatory and actual damages of no less than $5,165,000,000, the

6   exact amount to be determined at trial, according to proof;

7   (b)   for punitive damages;

8   (c)   for treble damages in accord with the RICO statute, 18 U.S.C. §§ 1961 *et*

9   *seq.*;

10  (d)   for attorney's fees and costs of suit, to the extent permitted by law;

11  (e)   such other relief as the Court deems just and proper.

12  Dated:   ~~July 24~~, 2013        **ARENT FOX LLP**

13

14                         By:  *Michael Zweiback*

15                              MICHAEL ZWEIBACK
                               *Attorneys for Plaintiff*
16                              *TIANGANG SUN*

17

18

19

20

21

22

23

24

25

26

27

28

1

2

### **DEMAND FOR JURY TRIAL**

3

Mr. Sun respectfully requests a jury trial on all issues triable thereby.

4

Dated: _July 24_, 2013          **ARENT FOX LLP**

5

6

7   By: _Michael Zweiback_

MICHAEL ZWEIBACK
*Attorneys for Plaintiff*
*TIANGANG SUN*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Beverly Reid O'Connell and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV13- 5355 BRO (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [/] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| TIANGANG SUN | CHINA PETROLEUM & CHEMICAL CORPORATION LIMITED |

| **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Michael Zweiback (michael.zweiback@arentfox.com)<br>ARENT FOX LLP<br>555 West Fifth Street, 48th Floor, Los Angeles, CA 90013<br>Telephone: 213.629.7400 Facsimile: 213.629.7401 | **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☒ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT:** $ $5,165,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. section 1350, and 18 U.S.C. section 1964(c). Complaint for Alien Tort Claims Act, Civil RICO, assault, intentional and negligent infliction of emotional distress, false imprisonment, and malicious prosecution.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:**<br>☐ 463 Alien Detainee | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 510 Motions to Vacate Sentence | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 535 Death Penalty | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY**<br>☐ 310 Airplane | **PERSONAL PROPERTY**<br>☐ 370 Other Fraud | **Other:**<br>☐ 540 Mandamus/Other | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 862 Black Lung (923) |
| ☒ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 340 Marine | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 441 Voting | **LABOR**<br>☐ 710 Fair Labor Standards Act | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpratice | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 220 Foreclosure | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** CV13-05355

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

| CV-71 (02/13) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:**  Has this action been previously filed in this court and dismissed, remanded or closed?   [x] NO      [ ] YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:**  Have any cases been previously filed in this court that are related to the present case?   [x] NO      [ ] YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)      [ ]  A. Arise from the same or closely related transactions, happenings, or events; or

[ ]  B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]  C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]  D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ] Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | People's Republic of China |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _Michael Zweiback_    DATE: _7-24-13_

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended.  Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

ORIGINAL

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| TIANGANG SUN | )<br>)<br>)<br>) |
| *Plaintiff(s)* | ) |
| v. | ) |
| CHINA PETROLEUM & CHEMICAL CORPORATION LIMITED, a joint stock limited company of the People's Republic of China; and DOES 1 to 10, inclusive | )<br>)<br>)<br>)<br>) |
| *Defendant(s)* | ) |

Civil Action No.  CV13-05355-BRO (Ex)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   CHINA PETROLEUM & CHEMICAL CORPORATION LIMITED
22 Chaoyangmen North Street
Chaoyang District, Beijing, 100728
The People's Republic of China

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Michael Zweiback
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: JUL 2 4 2013                                    _____
                                                                    *Signature of Clerk or Deputy Clerk*